[Cite as *In re S.R.*, 2024-Ohio-693.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
GALLIA COUNTY

| | | |
|---|---|---|
| In the Matter of: | : | Case No.    23CA11 |
| S.R. | : | <u>DECISION AND</u> <u>JUDGMENT ENTRY</u> |
| Dependent Child. | : | |

**RELEASED 2/22/24**

_____
APPEARANCES:

Steven H. Eckstein, Washington Court House, Ohio, for appellant.

Jason Holdren, Gallia County Prosecutor, and Emily VanSickle, Gallia County Assistant Prosecutor, Gallipolis, Ohio, for appellee.
_____
Hess, J.

{¶1}    S.R.'s mother appeals a judgment of the Gallia County Court of Common Pleas, Juvenile Division, granting permanent custody of S.R. to the Gallia County Job & Family Services, a.k.a. Gallia County Children's Services (the "Agency").  The mother assigns one error asserting that the permanent custody award was against the manifest weight of the evidence.  For the reasons which follow, we overrule her assignment of error and affirm the juvenile court's judgment.

## I.  FACTS AND PROCEDURAL HISTORY

{¶2}    On August 18, 2021, the Agency filed a complaint alleging that S.R., born September 25, 2017, was a dependent child. The complaint alleged that S.R. was in the care and custody of her mother and stepfather. The biological father's address was unknown. The Agency had received a report in January 2021 that mother and stepfather appeared to be "under the influence" and that the mother had admitted to using heroin

and methamphetamine. A safety plan was put in place at that time but ended in March 2021 due to significant progress on the case plan. However, afterwards mother tested positive for fentanyl and stepfather had been pulled over in his vehicle "with a cap of suspected illegal substances." A second safety plan was put in place and S.R. was placed with stepfather's mother. All interactions between mother, stepfather, and S.R. were to be supervised by stepfather's mother. However, during an unannounced visit, the Agency found S.R. in the unsupervised care of mother, stepfather, and an uncle. The complaint alleged that mother was not in compliance with her drug treatment and had been discharged from receiving services due to belligerent behavior. Neither mother nor stepfather had a valid driver's license, yet both had been observed driving with S.R. in the vehicle. The complaint also alleged that neither mother nor stepfather have been compliant in receiving their mental health treatment. The complaint requested a grant of temporary custody to the Agency. The juvenile court granted temporary custody that day and set the matter for an adjudication on September 9, 2021.

{¶3} On September 9, 2021, the juvenile court conducted an adjudication on dependency. Mother admitted the allegation of dependency. The juvenile court accepted the admission, found S.R. a dependent child whose guardianship should be assumed by the state under R.C. 2151.04(C), and ordered that S.R. remain in the temporary custody of the Agency. A month later, the juvenile court held a disposition hearing and mother stated that she agreed with S.R. remaining in the temporary custody of the Agency while she continued to work on completing the case plan. The biological father did not appear. Thus, the juvenile court ordered S.R. to remain in the Agency's custody and for mother to complete the court-approved case plan.

{¶4}   On December 9, 2021, the juvenile court held a review hearing and was informed that mother was noncompliant with her case plan and had very little contact with the Agency. The biological father did not appear and was not participating in the case plan. The court ordered S.R. to remain in the temporary custody of the Agency and the mother to continue to work on the case plan.  Another review hearing was held in February 2022 at which the court was informed that mother was "now in drug rehab and back in compliance with her case plan." The biological father did not appear and was not participating in the case plan.   The court ordered S.R. to remain in the Agency's custody and for mother to continue to work on the case plan.  At the April 2022 review hearing, the court was informed that mother completed her 30-day in-patient drug treatment program but has since tested positive for illegal drugs and has not obtained suitable housing or income. The Agency recommended a 90-day in-patient drug treatment program for mother. The juvenile court ordered S.R. to remain in the Agency's custody.

{¶5}   At a review hearing in June 2022, mother was making progress in drug rehabilitation, but still had not found suitable housing or income. S.R. was ordered to remain in the Agency's custody. At an August 2022 review hearing, mother had completed in-patient drug rehabilitation and found appropriate housing, but she had not obtained employment or obtained a mental health evaluation or counseling. S.R. remained in the Agency's custody.  At an October 2022 review hearing, the court found that mother had obtained a mental health evaluation and was compliant with mental health counseling, but "still needs to maintain sobriety, make repairs to and exterminate her residence." S.R. was ordered to remain in the Agency's custody. However, at a December 2022 review hearing, the court found that mother was not in compliance as

she was no longer attending mental health or drug counseling and was unemployed. The Agency indicated that it would file for permanent custody if no progress was made. S.R. was ordered to remain in Agency custody. At a February 2023 review hearing, the mother's status had not changed; she continued to be noncompliant with the case plan. The biological father was located and awaiting transport to prison for 5 years.

{¶6}     On March 16, 2023, the Agency filed a motion for permanent custody pursuant to R.C. 2151.413, R.C. 2151.414 and 2151.415. In support of the motion, the Agency contended that S.R. could not be placed with either parent within a reasonable time, S.R. should not be placed with either parent, and S.R. has been in the temporary custody of the Agency for 12 or more months or a consecutive 22-month period. In fact, at the time of the motion, S.R. had been in the Agency's custody for 18 months and 6 days. The Agency contended that mother was noncompliant with the case plan, struggled with substance abuse issues throughout the case, failed to comply with mental or drug counseling, was unemployed, only sporadically attended child visitation sessions, and failed to have her residence assessed by the Agency since October 2022. The Agency also stated that a foster parent had shown interest in adopting S.R. or becoming her legal guardian. The court scheduled a hearing on the motion for May 2023. Prior to the permanent custody hearing, an April 2023 review hearing was held, and the court found that mother continued to be noncompliant with the case plan, had not engaged in mental health counseling, and was unemployed, but had resumed drug counseling. Additionally, prior to the permanent custody hearing, the guardian ad litem filed a report which recommended S.R. be placed in the permanent custody of the Agency.

{¶7}    The permanent custody hearing took place on May 2, 2023. Lindsey Wolfe testified that she was employed with the Agency's Ohio Start program, which is a voluntary program for families with substance use issues that tries to keep families together. Wolfe had been involved with S.R.'s case since January 2021 and the safety plans that were implemented in early 2021 prior to the Agency's application for temporary custody. Wolfe testified that mother was not compliant with the safety plans, had failed multiple drug screens, failed to comply with drug and mental health counseling, and was transporting the child in a vehicle without a valid driver's license.  As a result, the Agency applied for temporary custody in August 2021. Wolfe testified that the case plan required mother to have a mental health evaluation and to be compliant with any mental health medication and counseling requirements, complete random and scheduled drug screenings, enroll in school or have employment, and maintain a clean, stable home environment. Wolfe testified that mother did have a mental health evaluation but was not compliant with the follow-up counseling. Mother also failed to gain employment, dropped out of an education program, and has made no further progress. The mother had entered a rehabilitation facility in Cincinnati; however, she had only entered the program the day before the permanent custody hearing.

{¶8}    Wolfe testified that mother also failed to establish safe, stable housing throughout the case. Wolfe was not able to make steady contact with mother to be able to see and approve the housing situation. Wolfe was able to perform one apartment inspection but could not complete a full evaluation because she was unable to inspect the bedrooms. In areas she could inspect, there were "clothes laying all over the floor. It appeared very messy, hadn't been cleaned." Wolfe testified that mother was inconsistent

in her struggles with substance abuse, testing positive for illegal substances and failing to show a commitment to her sobriety. Wolfe testified that mother's visitations with S.R. have "been on and off" with repeated no call, no shows. As a result, visitations were put on hold until mother could establish a plan in place to show up for the visitations. Wolfe was unable to assess mother's parenting abilities due to the inconsistencies in visitation. Mother never progressed beyond supervised visitation. Wolfe testified that she does not believe S.R. could be returned to mother now or in the immediate future. The biological father was in prison and Wolfe did not believe that custody of S.R. could be placed with him at that time or the immediate future. The stepfather had not completed any of the case plan. Wolfe testified that she believed it was in S.R.'s best interest to be placed in the permanent custody of the Agency and that the Agency had made reasonable efforts to prevent the removal of the child from the home. Wolfe testified that a teacher at S.R.'s elementary school has stated that she is willing to do kinship placement and/or adoption of S.R.

{¶9}    Chelsey Kloes, the guardian ad litem, testified that she visited S.R. monthly, but numerous meetings and conversations with mother failed because mother did not respond to telephone calls. Kloes testified that mother was noncompliant with the case plan and lacked commitment to sobriety and maintenance of sobriety. Kloes testified that S.R. loves her mother and is disappointed that visitations with her were not consistent. Mother was not visiting S.R. in January 2023 and had not visited S.R. prior to the permanent custody hearing in May 2023. Kloes testified that there are no viable family placement options, and, in her opinion, it was in S.R.'s best interest to be placed permanently with the Agency.

{¶10} Mother testified that she was currently in a residential drug rehabilitation center in Cincinnati, Ohio that allows for mother and child to be reunited while she is staying there. Mother testified that she would love to have S.R. reunited with her while she resides in the rehabilitation facility and is "willing to do whatever I can * * * to get [S.R.] back home." Mother testified that she did not understand the proceedings, "when this began I kind of misunderstood. Like I had thought they was [sic] taking permanency [sic] custody of her then. * * * I didn't really realize I still had you know, more time to keep her to myself." She testified she enrolled into the Cincinnati rehabilitation program because she was told "this is the end of the case plan. I don't know what else that I can do." Mother agreed she had not made any progress in the last couple of months but it was because she believed the Agency had already taken permanent custody of S.R.  She admitted she "kind of fell off" the case plan when the Agency talked about taking permanent custody of S.R. Mother testified that if given more time, she would get back involved with her case plan. Mother testified she gets along great with S.R. and they share a mutual love of each other. Mother testified that she had telephone problems that made it challenging for her to get in touch with the case worker and others.

{¶11}    On May 26, 2023, the court issued a judgment entry granting the Agency permanent custody of the child.  The court found that S.R. had been in the temporary custody of the Agency for 12 or more months of a consecutive 22-month period for purposes of R.C. 2151.414(B)(1)(d). The court also found that it was in the best interest of the child to award permanent custody to the Agency.

## II. ASSIGNMENT OF ERROR

{¶12} Mother presents one assignment of error:

The trial court's grant of permanent custody to the Gallia County Job and Family Services Children's Division was against the manifest weight of the evidence.

## III. LEGAL ANALYSIS

## A. Permanent Custody Award

{¶13} In her sole assignment of error, mother contends that the permanent custody award was against the manifest weight of the evidence. Mother asserts that her testimony "strongly counters that of the Agency's witnesses." She argues that she testified that she "misunderstood the status of the case and so gave up on the reunification case plan.* * * Had she thought otherwise she would have tried harder, as shown by her placing herself in rehab so close to the permanent custody hearing and in a place where the child could live with her."

## B. Standard of Review

{¶14} "A reviewing court will not reverse a trial court's judgment in a permanent custody case unless it is against the manifest weight of the evidence." *In re C.S.*, 4th Dist. Pike No. 19CA899, 2019-Ohio-5109, ¶ 21. We have explained:

> "To determine whether a permanent custody decision is against the manifest weight of the evidence, an appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving evidentiary conflicts, the trial court clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." [*In re T.J.*, 4th Dist. Highland Nos. 15CA15, 15CA16, 2016-Ohio-163,] ¶ 25, citing *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 20. In reviewing evidence under this standard, we defer to the trial court's determinations of matters of credibility, which are crucial in these cases, where demeanor and attitude are not reflected well by the written record.

*Eastley* at ¶ 21; *Davis v. Flickinger,* 77 Ohio St.3d 415, 419, 674 N.E.2d 1159 (1997).

In a permanent custody case the dispositive issue on appeal is "whether the trial court's findings * * * were supported by clear and convincing evidence." *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, 895 N.E.2d 809, ¶ 43; R.C. 2151.414(B)(1). "Clear and convincing evidence" is "that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus; *State ex rel. Pietrangelo v. Avon Lake*, 149 Ohio St.3d 273, 2016-Ohio-5725, 74 N.E.3d 419, ¶ 14. "[I]f the children services agency presented competent and credible evidence upon which the trier of fact reasonably could have formed a firm belief that permanent custody is warranted, then the court's decision is not against the manifest weight of the evidence." *In re R.M.*, 2013-Ohio-3588, 997 N.E.2d 169, ¶ 55 (4th Dist.).

(First alteration added.) *Id.* at ¶ 21-22.

### C. Statutory Framework and Analysis

**{¶15}** Under R.C. 2151.414(B)(1), a juvenile court may grant permanent custody to a public children services agency if the court determines by clear and convincing evidence that (1) any of the circumstances in R.C. 2151.414(B)(1)(a) through (e) apply, and (2) it is in the best interest of the child. In this case, the juvenile court found that R.C. 2151.414(B)(1)(d) applied, i.e., "[t]he child has been in the temporary custody of one or more public children services agencies * * * for twelve or more months of a consecutive twenty-two-month period * * *." Mother does not dispute that the child was in the temporary custody of the Agency for the requisite time; therefore, we must affirm the permanent custody award unless the juvenile court's best interest determination is against the manifest weight of the evidence.

**{¶16}** R.C. 2151.414(D)(1) states:

In determining the best interest of a child * * * the court shall consider all relevant factors, including, but not limited to, the following:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies * * * for twelve or more months of a consecutive twenty-two-month period * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

For the purposes of division (D)(1) of this section, a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to section 2151.28 of the Revised Code or the date that is sixty days after the removal of the child from home.

No one factor has "greater weight or heightened significance." *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 57.

1.  Interactions and Interrelationships of the Child

**{¶17}** There is evidence to support the juvenile court's finding that the child "has bonded with a foster caregiver. There is a strong possibility of adoption." While the child had some relationship with the mother during the proceedings, there was evidence that mother failed to attend visitation regularly and did not progress beyond supervised visitation. Mother did not visit the child at all in the four months prior to the permanent

custody hearing. There is evidence to support the juvenile court's finding that the mother "demonstrated a lack of commitment towards [S.R.] by failing to regularly support, visit, or communicate with the child when able to do so."

### 2. Wishes of the Child

**{¶18}** The child was too young to express wishes.

### 3. Custodial History

**{¶19}** The child was removed from the mother's custody when the child was three years old. The child was in the temporary custody of the Agency for 12 or more months of a consecutive 22-month period. At the time of the permanent custody hearing the child had been in the Agency's custody for over 18 months.

### 4. Legally Secure Permanent Placement

**{¶20}** The Ohio Revised Code does not define the phrase "legally secure permanent placement," but "this court and others have generally interpreted the phrase to mean a safe, stable, consistent environment where a child's needs will be met." *In re M.B.*, 4th Dist. Highland No. 15CA19, 2016-Ohio-793, ¶ 56. "A legally secure permanent placement is more than a house with four walls. Rather, it generally encompasses a stable environment where a child will live in safety with one or more dependable adults who will provide for the child's needs." *Id.*

**{¶21}** Evidence supports the juvenile court's finding that a legally secure permanent placement could not be achieved without a grant of permanent custody to the Agency. The Agency presented evidence that the child has been doing well in the Agency's temporary custody and that a teacher at S.R.'s school is interested in adoption. As the juvenile court found, the mother "has failed to remedy the problems that led to the

child's removal." Mother was struggling with substance abuse issues in January 2021 and continued to struggle with them throughout the case up to the May 2023 hearing. Evidence also supports the juvenile court's finding that "the child cannot and should not be returned to the custody of either parent within a reasonable time." The biological father was incarcerated for a five-year term. The juvenile court noted that it was glad to hear that mother was again in a rehabilitation program, but "she only entered the facility the day before this permanent custody hearing." Additionally, while the mother secured an apartment during the proceedings, the Agency was not able to determine its suitability due to the lack of communication from the mother. Therefore, there was evidence supporting the juvenile court's finding that the residence was "unsatisfactory." The juvenile court further noted that mother had been granted an additional six months in which to complete the case plan, but despite this extra time, she had not succeeded. Although mother testified that she was confused about the status of her case, she appeared at numerous review hearings, had appointed counsel, and never expressed confusion or asked questions. As the state correctly argues, every filing and journal entry prior to the permanent custody hearing states that the child is in the temporary custody of the Agency while the mother continues to work on the case plan of reunification. Whether mother was truly confused or whether, as the state argues, her testimony was "self-serving" is a question of credibility for the juvenile court's determination. The juvenile court was in the best position to judge credibility, and we defer to its credibility determinations. *In re C.S.*, 4th Dist. Pike No. 19CA899, 2019-Ohio-5109, ¶ 21.

### 5. R.C. 2151.414(E)(7) to (E)(11) Factors

**{¶22}** The juvenile court did not identify any factors in R.C. 2151.414(E)(7) to (E)(11) and there is nothing in the record to indicate they are applicable to this case.

### 6. Totality of the Circumstances

**{¶23}** Based on the foregoing, we conclude the juvenile court's best interest finding is not against the manifest weight of the evidence. The Agency presented competent and credible evidence upon which the court reasonably could have formed a firm belief that a grant of permanent custody to the Agency was in the best interest of the child. Accordingly, we conclude that the permanent custody award is not against the manifest weight of the evidence, overrule the sole assignment of error, and affirm the juvenile court's judgment.

JUDGMENT AFFIRMED.

## <u>JUDGMENT ENTRY</u>

It is ordered that the JUDGMENT IS AFFIRMED and that appellant shall pay the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Gallia County Common Pleas Court, Juvenile Division, to carry this judgment into execution.

Any stay previously granted by this Court is hereby terminated as of the date of this entry.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Smith, P.J. & Wilkin, J.: Concur in Judgment and Opinion.


For the Court



BY: _____
Michael D. Hess, Judge




### NOTICE TO COUNSEL

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**